BRANNON ET AL. v. HAYES, ADMINISTRATOR.

[No. 23,660.   Filed April 19, 1921.]

1. CANCELLATION OF INSTRUMENTS.—*Contracts.*—*Rescission After Execution.*—The mere fact that a contract for care and support was executed would not preclude its rescission. p. 428.

2. CANCELLATION OF INSTRUMENTS.—*Contracts.*—*Disaffirmance.* —Where decedent died in January and in April following her administrator served written notice on defendants, disaffirming a contract made with them by decedent on the ground of her mental incapacity and demanding the return of money defendants had received under such agreement, and, following the expiration of the time given for compliance with the notice, prompt application was made to the court for relief, the administrator was not guilty of *laches.* p. 428.

3. CANCELLATION OF INSTRUMENTS.—*Contracts.*—*Disaffirmance on Ground of Mental Incapacity.*—*Complaint.*—*Offer to Place Defendants in Statu quo.*—In an administrator's action to rescind his decedent's contract on the ground of her mental incapacity, where the complaint alleged that decedent was mentally incompetent to transact her business affairs at the time of the making of the contract and that such fact was known to defendants, plaintiff was not required to allege a tender or offer to put defendants in *statu quo;* nor did he have the burden of furnishing proof on which the court could make allowance to defendants for services or money expended by them out of funds for which they should otherwise account to the administrator, since plaintiff was only bound to establish the essential allegations of his complaint. p. 428.

4. CONTRACTS.— *Rescission.*— *Tender of Consideration.*— Where decedent placed her property in the hands of defendants pur-

suant to an agreement stipulating that they should furnish her care and support, transact her business affairs, etc., in return for which they were to have whatever of such property as might remain at her death, her administrator suing for a rescission of such contract was not required to place defendants in *statu quo*, even though there was no finding that they had obtained an unfair advantage from decedent, in view of the unilateral terms of the contract and of the fact that decedent was mentally incompetent to transact her business affairs at the time the contract was executed.  p. 429.

5. CONTRACTS.—*Avoidance.*—*Mental Infirmity.*—Mental infirmity alone may be a sufficient ground for setting aside a contract and, although mere weakness of mind, uncoupled with fraud, undue influence or other circumstances, would not be sufficient to avoid a contract yet where at the time of the making of a contract there is an incapacity to understand and act with discretion in the ordinary affairs of life, avoidance may be had. p. 430.

From Lake Circuit Court; *E. Miles Norton*, Judge.

Action by Benjamin F. Hayes, administrator of the estate of Eliza M. Pratt, deceased, against Lizzie Brannon and another. From a judgment for plaintiff, the defendants appeal. *Affirmed.*

*Foster Bruce, George E. Hershman* and *Otto J. Bruce*, for appellants.

*Frank B. Pattee* and *Herbert T. Johnson*, for appellee.

MYERS, J.—On a complaint in three paragraphs answered by a general denial, appellee in the court below recovered a judgment against appellants for $9,289.57. Appellee, in each of his three paragraphs of complaint, relied upon a disaffirmance of a certain written contract executed by his decedent on October 12, 1915, whereby it was stipulated that appellants were to care for Mrs. Pratt during her lifetime, invest any money she might have, transact all of her business, pay her necessary doctor bills, funeral expenses, and expenses of last sickness, and in consideration for these services

appellants were to have whatever of such property as might remain. Pursuant to this agreement, Mrs. Pratt paid to appellant $7,596.77, which she received on October 18, 1915, through the will of Aurelia W. Pratt. It is then alleged that at the time this agreement was executed the decedent "was feeble, infirm, weak and mentally incompetent to transact business and was, by reason of said facts, incapable of transacting the business of entering into said contract; that the defendants well knew said facts at the time of joining the said decedent in said alleged agreement; that due to the mental incapacity of said decedent to execute said contract the same was and is illegal, invalid and void; that said defendants have no right to or interest in the said decedent's money or property for the reason that the same was obtained from said decedent and transferred to said defendants by her pursuant to said alleged agreement and not otherwise; that at the time said instrument was made and said money paid over to said defendants thereunder said decedent was 86 years of age." Then follows allegations concerning the service of notice on appellants of disaffirmance and the demand incorporated therein that they pay him all money so held by them from his decedent, and for an accounting within ten days from date of notice. The second paragraph includes the allegations of the first, with the additional allegation that appellants exerted undue influence over the decedent whereby she was induced to make the contract and to deliver to them the money aforesaid. The third paragraph proceeded upon the theory of mental incapacity of the decedent to understand the nature of the contract, undue influence by appellants over decedent, and by certain fraudulent acts and representations they induced her to sign the contract and pay appellants the money demanded by appellee.

At the request of the parties the court made a special

finding of facts and stated its conclusions of law thereon. In this court appellants predicate error on the conclusions of law, and on the action of the court in overruling their motions for a new trial and to modify the judgment.

While the special findings cover thirty-one typewritten pages of the record, we deem it sufficient, for a general understanding of the questions here presented, to refer to them in the most part generally. They furnish a biographical sketch of the life and affairs of Mrs. Eliza M. Pratt from the time of her husband's death in 1893 down to the time of her death January 19, 1918. From the facts found it appears that on August 12, 1915, accompanied by these appellants, she went to the office of her attorney and had him prepare for her a will, whereby she devised all her estate to her three daughters equally with a provision for paying any person who should care for her in case she required attention. On October 12, 1915, accompanied by these appellants, she again went to the office of her attorney and stated to him that she desired to make disposition of her property during her lifetime, and requested that he prepare a contract. The attorney, after consulting with the three, prepared the contract in question, which was signed by all, and by the terms of which appellants were to care for Mrs. Pratt during her lifetime, take charge of and manage all her property, invest her money, transact her business, pay her necessary doctor bills, funeral expenses and expenses of last sickness, and the balance to become their property. Mrs. Pratt left, as her only heirs, three daughters, namely, Florence B. Pratt, Josephine A. Pratt, and Lizzie P. Brannon, one of the appellants herein. On February 25, 1918, appellee was appointed administrator of Mrs. Pratt's estate. On April 4, 1918, appellee served written notice on appellants, informing them of his disaffirmance

of the contract, and demanding all money of his decedent theretofore received by them. For several years prior to the death of Mrs. Pratt, Florence and Josephine taught school in the city of Chicago and their mother kept house for them during the school year, and until the vacation period in 1912, when she returned to her home in Crown Point, and there remained until February, 1915, when, through the influence of her children, she again accompanied her two single daughters to Chicago. She returned to Crown Point in June of that year, where she remained until her death. She did not want to live in Chicago and was always anxious to return to Crown Point and to her own home. From and during 1912, decedent's only money income was the interest on a $1,200 mortgage, and money furnished to her by her three daughters, each contributing about the same amount. She had a life estate in the Pratt homestead in which she resided when in Crown Point. Soon after the contract was executed the $1,200 mortgage was transferred to appellants. On October 18, 1915, through a testamentary devise from a relative in California, Mrs. Pratt received $7,596.77, and on the same day she turned it over to appellants, who thereupon caused it to be placed on interest at six per cent. per annum; that this money has been kept loaned, except portions thereof used by appellants in paying the debts and claims against the decedent, both before and after her demise; that appellants have not been reimbursed for any of these expenditures or paid for their services, nor has any one offered to reimburse them. Within a few days after Florence and Josephine learned of the contract, Florence commenced proceedings in the Lake Circuit Court to have a guardian appointed for her mother, but this proceeding was not pressed, and on the death of Mrs. Pratt it was dismissed.

In the year 1913, or early in 1914, Mrs. Pratt notice-

ably developed senile dementia, and continuously thereafter gradually grew weaker, physically and mentally, until she died.   Early in 1914 she lost the sight of one eye, and later her other eye became affected.   About this time she partially lost her hearing, which grew worse during the remainder of her life.   In 1913 and thereafter she was subject to dizzy spells which would last for several minutes.   She frequently complained of pain in her head, and sometimes would express the belief that she was losing her mind.   While in her home or about her premises, she would often become confused as to her whereabouts and required physical and mental assistance in order to get her bearings.   For three or four months prior to her death she was distrustful, suspicious, and abnormally irritable, and preferred to be alone rather than in the company of others, contrary to her habits when in normal health.   She would lock the doors of her home and objected to her daughters or any one else cleaning the furniture and rooms.   She developed a tendency to dislike her daughters Florence and Josephine, and sought to keep them out of the house. She would use an oil lamp in her room in preference to electric lights, until appellants removed the oil lamp. She would hide her laundry to prevent her daughters from having the same washed for her, and would insist upon washing it herself. . She had a habit of talking to herself and would at times talk as if speaking to persons present, when in fact no persons were present. At times she became confused and mistakingly believed her yard and porch to be torn up and disturbed.   At times she complained of seeing different colors before her eyes.   Old account books, which had been in the house many years, she sent to an accountant for examination as to whether or not they had been properly kept.   On the day she received the California money, and six days after making the contract in question,

she talked of selling some old furniture and chinaware to get spending money, and a few days later she talked of disposing of the $1,200 security in order to obtain money for herself. Decedent became suspicious of her daughter Florence, in whom, while in normal health, she had great confidence. Appellant Lizzie Brannon discovered and knew of the condition of the decedent on and before October 23, 1914, and on that date wrote a letter to Florence Pratt, saying that her mother was losing her mind at times. Appellants, from and after October 23, 1914, when decedent was at her home, called on her and saw to her wants from three to four or more times a day, and knew of her physical and mental condition. After making the contract in question, appellants called on decedent more frequently than before, and administered to her wants and provided her with food and diligently looked after her affairs.

Before, at the time of, and after the signing of the contract with appellants, Mrs. Pratt was able to converse with people and to understand what they said and make them understand her, and appeared to have a fairly intelligent understanding of what she was saying and doing and of what the contract herein contained. At times, a stranger would not detect her mental infirmities, but her mind was such as to interfere with and did prevent her from exercising her normal and rational judgment, and overcome abnormal prejudices, and could not exercise rational mental functions in making the contract. On October 12, 1915, decedent was feeble and infirm, weak and mentally incompetent to transact business, and was by reason of said facts incapable of transacting business or of entering into the contract, to the knowledge of appellants, and she so remained until her death. Appellants obtained the sum of $7,596.77 from the decedent by virtue of the purported contract and not otherwise.

Brannon *v.* Hayes, Admr.—190 Ind. 420.

Upon the facts found, the court declared the law: "(1) The court concludes, as a matter of law, that the instrument purporting to be the contract of Eliza M. Pratt, deceased, and bearing date of October 12, 1915, as set forth in the findings herein was, at the time the same was made, voidable; that the same was disaffirmed by the plaintiff before this action was commenced, thereby rendering the same void on account of the mental incapacity of said decedent to enter into and properly execute the same. (2) The court concludes that the plaintiff is entitled to recover from the defendants said sum of $7,596.77, together with interest thereon at 6% per annum, from the 18th day of October, 1915."

The record in this case affirmatively shows that the decision of the trial court rests upon the first paragraph of the complaint. The gist of that paragraph is that appellants well knew of the mental incompetency of Mrs. Pratt to understand the nature and effect of her act at the time she executed the contract in question. These allegations the court found to be true, but the record discloses that appellants, in the trial court, defended upon the theory, and they are here contending, that, as this is a suit for rescission of an executed contract, plaintiff must fail because of his omission to place or offer to place the defendants in *statu quo*.

Appellee does not challenge the general rule announced by appellants, but insists that it has no application in this case, for the reason that the facts bring it within the rule equally well established, which relieves the complaining party from returning the other to his former position, when such return is rendered impossible by the party whose conduct affords grounds for rescission.

The relief demanded by appellee in each of his paragraphs of complaint is in form such as might be ex-

pected in actions at law, but whether the pleader's purpose was a suit in equity or an action at law is of no moment, for we are satisfied, from the leading allegations of the complaint and from the theory adopted at the trial, that the ultimate object of appellee was the rescission of the contract in question. Appellee having adopted the remedy of rescission which, with rare exceptions, involves inquiry as to whether the parties can be put back in *statu quo* (*Grymes* v. *Sanders* [1876], 93 U. S. 55, 62, 23 L. Ed. 798), we are not surprised at appellants' insistence. Our attention is called to the conclusions of law. For the purpose of this contention, the special finding of facts is admitted to be complete and true. It thus appears that the entire estate of appellee's decedent remaining was in the hands of and under the control of appellants, that appellants had fully complied with the contract on their part, and that it was fully executed. However, we may say that the mere fact that the contract was executed would not preclude a rescission. *Louisville, etc., R. Co.* v. *Herr* (1893), 135 Ind. 591, 593, 35 N. E. 556; *Ashmead* v. *Reynolds* (1891), 127 Ind. 441, 26 N. E. 80.

The contract related to personalty only, and without question it was timely disaffirmed by appellee on the ground of mental incapacity of his decedent to enter into it. The declaration of disaffirmance was unequivocal and the time given for compliance was followed by prompt application to the court, and therefore we have no question involving *laches* on the part of appellee. Bispham, Principles of Equity (9th ed.) §472.

Again referring to the *statu quo* rule relied on by appellant, this court in *Barkley* v. *Barkley* (1914), 182 Ind. 322, 327, 106 N. E. 609, L. R. A. 1915B 678, said: "It is settled that where the mental

incompetency of the one who has made the conveyance or other contract is known to the other at the time it was made no allegation of a tender or offer to restore the consideration is a necessary averment of the complaint." Applying the principle just quoted to the case now before us, it certainly does not follow that plaintiff must go further in his proof than is necessary to establish the essential allegations of a good complaint. Hence, appellee having alleged incompetency on the part of his decedent to contract, and knowledge by appellants of that fact at the time of making the contract, and these facts having been found by the trial court upon the evidence, it will not do to say that appellee has not met the issue thus tendered. It is true this was a suit in equity, and governed by equitable principles which gave the court a wide discretion in the matter of adjusting and protecting the rights of the parties, but as we are at present advised, we know of no rule or principle applicable to the facts before us which would place the burden on appellee to come forward with proof whereby the court would be furnished a basis on which to make allowances to appellants for services and for money expended by them out of funds for which they should otherwise account to appellee.

Appellants also insist that the *statu quo* rule should be enforced in the instant case for the reason that there is no finding that appellants, by virtue of the 4. contract, obtained from the decedent an unfair advantage. There is no enforceable stipulation in the contract whereby appellants could be compelled to pay any money or part with any property of their own, nor that they did so. The consideration for the contract on their part was personal services in the way of care, attention, and the exercise of business judgment in handling of her estate. The value of these services were unliquidated and the court finds that appellants

received the money in question solely by reason of the contract. The unilateral terms of the contract, and knowledge of the mental infirmity of the decedent at the time of making the contract, were effective as a finding of unfair advantage. Under these circumstances, restitution, or offer to restore, was not a prerequisite to an avoidance.

Again noticing that appellants did make payments out of the funds in their hands on account of matters for which they probably should have received credit, it will be observed that there is no finding as to the items paid or the aggregate amount of these items so paid, and, upon an examination of the evidence on this subject, we find no proof whatever from which the court could have found these facts.

The evidence introduced on this subject was for the purpose of showing that the contract had been fully executed, and the court evidently so treated it. The record in this case conclusively shows that the only issue submitted to the trial court for decision was the validity of the contract. In this respect appellants say that it was not invalid because of any fraud or undue influence practiced by appellants upon the decedent, and in support of their contention insist that this must be true for the reason that the court failed to find fraud or undue influence. If the conclusions of law depended upon the finding of these facts, then appellants' position would be correct, but it must be remembered that mental infirmity may be a sufficient ground for setting aside a contract whether there was actual fraud or not. *Hull* v. *Louth, Gdn.* (1887), 109 Ind. 315, 324, 10 N. E. 270, 58 Am. Rep. 405. Of course, mere weakness of mind, uncoupled with fraud, undue influence, or other circumstances, would not be sufficient to avoid a contract (*Ashmead* v. *Reynolds* [1893], 134 Ind. 139, 147, 33 N. E. 763, 39 Am. St. 238), but where

as here, it appears that at the time of making the contract there was incapacity of understanding and of acting with discretion in the ordinary affairs of life, the case is within the test of unsoundness of mind, and avoidance may be had. *Darnell* v. *Rowland* (1868), 30 Ind. 342, 346; *Raymond* v. *Wathen* (1895), 142 Ind. 367, 374, 41 N. E. 815.

As to the question of any allowances to appellants for services performed, or money of the decedent expended by them for her use and benefit, we hold that these matters were not before the court, and the finding to which we have just referred has no influence on the conclusions of law, and as to these matters they must be regarded as open questions and unprejudiced by any ruling made in this case. *Citizens Nat. Bank* v. *Judy* (1896), 146 Ind. 322, 43 N. E. 259. The decision of the court will not be disturbed on account of the conclusions of law.

Appellants in support of their motion for a new trial earnestly insist that there was no evidence tending to show mental incompetency on the day she executed the contract. Our first impressions of the evidence to prove this fact led us to go into the evidence carefully, and from which we conclude the evidence before the court was sufficient to justify its decision.

The only other ground relied on in the motion for a new trial is that the assessment of the amount of recovery was too large. What we have already said on the issue submitted to the court requires us to deny this claim. For the same reason the motion to modify the judgment was not well taken.

In conclusion, upon the claimed errors brought to our notice, we are convinced that the judgment of the trial court must stand.

Judgment affirmed.